**H. Gene COMER, Plaintiff,**

**v.**

**AMERICAN ELECTRIC POWER,**
**Defendant.**

**No. 1:97–CV–269.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 28, 1999.

---

**5.** Monroe Declaration at ¶ 5.

**6.** *Id.*

C. Erik Chickedantz, Hawk Haynie Gallmeyer and Chickedantz, Fort Wayne, IN, pro se.

Thomas M Kimbrough, Cathleen M Shrader, Barrett and McNagny, Fort Wayne, IN, for H. Gene Comer.

Edward L. Murphy, Jr., Miller Carson Boxberger and Murphy, Fort Wayne, IN, for American Electric Power.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the Court[1] on the Defendant's motion for judgment as a matter of law, which it initially submitted at the close of the Plaintiff's case-in-chief on the second day of the three-day jury trial in this case. *See* Fed.R.Civ.P. 50(a)(1). The Court initially took the Defendant's motion under advisement, the Defendant proceeded with its case-in-chief, and then renewed the motion at the close of all the evidence. *See* Fed.R.Civ.P. 50(a)(2). The Court again took the motion under advisement and submitted the case to the jury, *see* Fed.R.Civ.P. 50(b), which returned a verdict in favor of the Plaintiff and against the Defendant. The Court did not enter judgment on the verdict, but rather directed the parties to brief the issues raised in the Defendant's motion. *Id.*

The Defendant filed its initial brief in support of its motion on February 1, 1999. As explained more fully *infra*, the crux of the Defendant's motion challenges the admissibility of the testimony of the Plaintiff's expert witness, Dr. Phillip Nine ("Dr. Nine") under Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We stayed further briefing on the Defendant's motion because of the pendency in the United States Supreme Court of the case of *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Cf. Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 609 (7th Cir.1993) (delaying judgment in a case challenging expert testimony because of the pendency of *Daubert*). The Supreme Court rendered its decision in *Kumho Tire* on March 23, 1999, the Defendant filed a supplemental brief in support of its motion on April 6, 1999, the Plaintiff filed a response on April 22, 1999, the Defendant filed a reply on May 10, 1999, and the motion is now ripe for review. For the

reasons hereinafter provided, the Defendant's motion for judgment as a matter of law will be GRANTED.

## II. STANDARD OF REVIEW

■ Before reciting the relevant factual history, we shall first identify the appropriate standard of review. Although this is a diversity action, we must apply the standard of Fed.R.Civ.P. 50 in evaluating the sufficiency of the evidence. *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 343 (7th Cir.1995) (quoting *Mayer v. Gary Partners & Co.,* 29 F.3d 330, 335 (7th Cir.1994)).[2] Thus, "[w]e must view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists any evidence upon which a jury could reach a verdict for the party producing it, upon whom the onus of proof is imposed." *Deimer,* 58 F.3d at 343 (internal quotation marks and citation omitted).

■ However, the threshold question raised by the Defendant's Rule 50 motion—the admissibility of Dr. Nine's expert testimony—is not an issue of fact that must be resolved in the Plaintiff's favor. *Deimer,* 58 F.3d at 343–45 (applying a deferential standard of review to the district court's application of *Daubert* in affirming the district court's decision to disallow the plaintiff's expert testimony and grant the defendant's motion for a judgment as a matter of law). *Cf. General Elec. Co. v. Joiner,* 522 U.S. 136, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party .... But the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse of discretion standard."). Therefore, we need not view the facts and evi-

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Perhaps more importantly for the purposes of the Defendant's motion, the admissibility of

expert testimony in diversity cases is governed by the Federal Rules of Evidence. *Stutzman v. CRST, Inc.,* 997 F.2d 291, 295 (7th Cir.1993).

dence pertaining to Dr. Nine's testimony in a light most favorable to the Plaintiff, but must scrutinize them in the same manner as any other evidentiary ruling. *See Kumho Tire*, 526 U.S. at ——, 119 S.Ct. at 1176 ("Our opinion in *Joiner* makes clear that a court of appeals is to apply an abuse-of-discretion standard when it 're-view[s] a trial court's decision to admit or exclude expert testimony.' ") (quoting *Joiner*, 118 S.Ct. at 515); *see also American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 539 n. 1 (7th Cir.1999) ("[T]he standard of review with respect to evidentiary rulings is abuse of discretion, even when we are reviewing [a] grant of summary judgment.") (citations omitted).

## III. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The testimony of Dr. Nine was the subject of rather sharp controversy throughout this litigation; in retrospect, this is it should be, given that his testimony frequently vacillated in material and unexpected ways, all in an obvious effort to pin some sort of liability on the Defendant. The sometimes substantial discrepancies between Dr. Nine's various conclusions throughout this litigation are certainly relevant to our Rule 702 analysis, but it would be unduly cumbersome to catalog the entire background of Dr. Nine's testimony here. Therefore, we shall limit our factual recitation to an overview of Dr. Nine's trial testimony, and will refer to the pertinent portions of his reports, deposition, and affidavit where appropriate in our analysis.

The basic background facts are relatively simple and undisputed. The Plaintiff owned a house located at 404 Westwood Drive in Winchester, Indiana, which was supplied electrical utility power service by the Defendant. (8/11/98 at 58–59.)[3] The wires providing electric service to the Plaintiff's residence, as well as four neighboring residences, were connected to a transformer and secondary conductor located on a utility pole on the northwest corner of the Plaintiff's property. (8/12/98, at 66, 72.) Two "hot" wires transporting 120 volts each and one ground wire ran from this transformer into the panel distribution box (also referred to as the circuit breaker box) in the Plaintiff's garage. (Def. Tr. Exh. G.) Inside the Plaintiff's panel distribution box, just as in every home, the two "hot" wires were protected by insulation. The typical service rating for this insulation is 600 volts, which means that something in excess of 600 volts of electricity would be required to cause such insulation to fail, assuming that the insulation is in good working order and has no defects.

On February 4, 1996, while the Plaintiff was in Florida, a fire occurred at the Plaintiff's residence that resulted in $141,-980.40 in damages. (8/11/98 at 59, 60.)[4] Bill Yost, Chief of the Winchester Fire Department, who investigated the fire, as well as Dr. Nine and Steven Shand ("Shand"), one of the Defendant's experts, all opined at trial that the fire originated in the panel distribution box in the Plaintiff's garage. (8/11/98 at 103 (Fire Chief Yost); 8/12/98 at 56–59 (Dr. Nine); 8/12/98 at 215–20 (Shand).) More specifically, both Dr. Nine and Shand testified that at the time of the fire the insulation protecting the two "hot" wires failed, causing the electricity to "arc" between the unprotected wire and the metal door of the panel

---

**3.** An official transcript of the trial proceedings was filed by the Court Reporter on August 28, 1998, and January 13, 1999. For the sake of convenience, we shall cite to these transcripts by indicating the date (*e.g.*, 8/11/98) and page number of the official transcript.

**4.** At or around the time of the fire, several of the Plaintiff's neighbors who were serviced by the same transformer as the Plaintiff experienced electrical problems, which mainly included damage to electrical appliances such as garage door openers, televisions, video game systems, VCR's, telephone answering machines, washing machines, etc. (*See* 8/11/98 at 121–24, 129–30, 141–42.)

distribution box.[5] Both experts agreed that this arcing condition burned several holes through the door of the panel distribution box, and caused the wood of the garage to catch fire. (*See* 8/12/98 at 56–59 (Dr. Nine); 8/12/98 at 215–20 (Shand)).

The experts differed as to the cause of the arcing condition. According to Dr. Nine a "high voltage phenomenon of some sort" (i.e., a "voltage surge") damaged the protective insulation on the wires, which caused the arcing condition that led to the fire. (8/12/98 at 65.)[6] In Dr. Nine's opinion the voltage surge was caused by a "loose neutral" connection on the transformer that serviced the Plaintiff's house. (8/12/98 at 75–78.) Specifically, when asked to relate the significance of a loose neutral to the fire at the Plaintiff's house, Dr. Nine testified:

> Well, the [Plaintiff's] residence had very little connected to the power system, since they were—since there was no one in the home, and so all of the—all of the residences connected to the transformer would see the same voltage surge. But it just so happened that the [Plaintiff's] residence, the insulation at the [Plaintiff's] residence was the weakest of any-place and it caused the failure of the insulation at the [Plaintiff's] residence. And just the damage to the other things that were on in the other residences.

8/12/98 at 77–78.

On cross-examination Dr. Nine acknowledged that the neutral could not have been broken at the time of the fire, because the four other houses serviced by the transformer had electrical service after the fire without any problems. (*See* 8/12/98 at 126.) Rather, based on these "events," Dr. Nine hypothesized that on the day of the fire the neutral became loose, which

caused the voltage surge that led to the fire, and that the neutral re-established itself after the fire. (8/12/98 at 126–27.)

With these facts in mind, we shall first rule on the admissibility of Dr. Nine's testimony, and then turn to the merits of the Defendant's Rule 50 motion. *Accord Deimer,* 58 F.3d at 345.

## IV. APPLICATION OF FED. RULE EVID. 702 TO THE TESTIMONY OF DR. NINE

### A. Legal Principles—*Daubert, Joiner, and Kumho Tire*

■ The admissibility of expert testimony—whether based on "scientific," "technical," or "other specialized" knowledge—is governed by the Supreme Court's general holding in *Daubert,* which requires the district court to exercise a "gatekeeping" function to ensure that such testimony is both reliable and relevant. *Kumho Tire,* 526 U.S. at ——, ——, 119 S.Ct. at 1171, 1176; *see generally Daubert,* 509 U.S. at 589–92, 113 S.Ct. at 2794–96. The fundamental purpose of this gatekeeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1176. In the wake of *Daubert* the Seventh Circuit has endorsed a two-step analysis for the district courts to use in evaluating expert testimony under Rule 702; first, the court must determine whether the expert's testimony is "reliable," and second, the court must determine whether the expert's testimony is

---

**5.** Dr. Nine described "arcing" as "a phenomenon in which electricity passes through the air that has been ionized, and when that happens, you get heats that are in excess—well, they're thousands of degrees. And in arcing, that's always accompanied by the melting of metal, even steel, and steel takes several thousand degrees to melt. So arcing is a high temperature phenomenon ..." (8/12/98 at

49.) Shand provided a similar explanation. (*See* 8/12/98 at 216.)

**6.** Defendant's expert Shand disagreed with Dr. Nine, and attributed the arcing to defects in the wires within the panel distribution box, not an abnormally high voltage surge.

"relevant." *See, e.g., United States v. Hall,* 165 F.3d 1095, 1101–02 (7th Cir. 1999); *Cummins v. Lyle Industries,* 93 F.3d 362, 367 (7th Cir.1996); *Deimer,* 58 F.3d at 344; *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 614–16 (7th Cir.1993); *accord Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1171 ("[*Daubert* ] pointed out that [expert] testimony is admissible only if it is both relevant and reliable."); *id.* 119 S.Ct. at 1176 ("The objective of [the *Daubert* gatekeeping requirement] is to ensure the reliability and relevancy of expert testimony.").

The basic task of the district court with regard to the first prong of the test is "to ensure that the evidentiary submission is of an acceptable level of 'evidentiary reliability.'" *Cummins,* 93 F.3d at 367 n. 2 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795). In other words, "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire,* 119 S.Ct. at 1175 (brackets in original) (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796). At bottom, the fundamental purpose of the reliability inquiry is to "rule out 'subjective belief or speculation.'" *Porter,* 9 F.3d at 614 (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795); *see also Cummins,* 93 F.3d at 367 ("a district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks.") (internal quotation marks omitted) (quoting *Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 901 (7th Cir. 1994)).

Importantly, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1171 (citing *Joiner,* 118 S.Ct. at 517); *see also id.* 119 S.Ct. at 1176 (emphasizing that the abuse of discretion standard articulated in *Joiner* "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.").[7]

As for the relevance inquiry, the Seventh Circuit recently explained that:

> . . . the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in

7. This holding of *Kumho Tire* would appear to alter the standard previously employed by the Seventh Circuit in reviewing district court decisions to admit or exclude expert testimony, in that the Seventh Circuit first applied a *de novo* standard to the question of whether the district court properly applied the *Daubert* "framework" before proceeding to review the district court's ultimate decision to admit or exclude the expert testimony. *See, e.g., Hall,* 165 F.3d at 1101; *Ancho v. Pentek Corp.,* 157 F.3d 512, 515 (7th Cir.1998); *United States v. Vitek Supply Corp.,* 144 F.3d 476, 484 (7th Cir.1998); *United States v. Yoon,* 128 F.3d 515, 527 (7th Cir.1997); *Cummins,* 93 F.3d at 367; *Bradley v. Brown,* 42 F.3d 434, 436 (7th Cir.1994).

Similarly, *Kumho Tire* indicates that the district courts are not required to consider the familiar *Daubert* "factors" (i.e., whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, whether it has a known or potential error rate, and whether it enjoys a general acceptance within a relevant scientific community) in every case involving expert testimony. Rather, the Supreme Court held that the decision to apply some or all of the *Daubert* factors in a particular case lies within the district court's discretion. *Kumho Tire,* 119 S.Ct. at ——, 119 S.Ct. at 1175 ("the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.") (citation omitted); *id.* 119 S.Ct. at 1176 ("whether *Daubert* 's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.") (citing *Joiner,* 118 S.Ct. at 517).

As explained *infra,* the factors listed in *Daubert* are not pertinent in assessing reliability in this case. Rather, the relevant reliability concerns here necessarily focus upon Dr. Nine's personal knowledge and the factual basis for his conclusions.

issue. This second step requires that the district court consider whether the proposed scientific testimony fits the issue to which the expert is testifying. In other words, a district court may admit expert testimony only if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue.

*Hall,* 165 F.3d at 1102 (internal quotation marks and citations omitted).

With this legal framework in mind, we shall proceed to the reliability and relevance inquiries.

### B. Reliability

#### 1. Formulation of the Reliability Inquiry

First, as *Kumho Tire* suggests, the district court must exercise its discretion to determine how to structure the reliability inquiry. Dr. Nine is an electrical engineer, *see* 8/12/98 at 38–45, and therefore we shall look to *Kumho Tire* for guidance because that opinion specifically discussed the application of *Daubert* to engineering testimony. *Kumho Tire* explained that in some cases the reliability issues may implicate the scientific foundation for the engineering testimony, while in other cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1175. In this particular case the Defendant's argument focuses on Dr. Nine's personal knowledge, contending that his testimony is inadmissible because his opinions lack a reliable factual foundation. *See* Def. Mem. in Supp. at 26 (Docket # 81); Def. Supp. Mem. in Supp. at 4 (Docket # 87). In the exercise of our gatekeeping role we also believe that the relevant reliability concerns in this case focus on Dr. Nine's personal knowledge, not on his scientific methodology. Specifically, our detailed review of the record has left us with the firm conclusion that no reliable factual basis exists for any of Dr. Nine's conclusions.

Contrary to the Plaintiff's suggestion, the district court's review of an expert's testimony is not limited to the expert's methodology. Indeed, Rule 702 requires the district court to review the reliability of an expert's conclusions when appropriate:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Joiner,* 118 S.Ct. at 519 (citation omitted). The point is, "an opinion has a significance proportioned to the sources that sustain it," *Huey v. United Parcel Serv.,* 165 F.3d 1084, 1087 (7th Cir.1999) (citation omitted), and consequently an expert opinion that lacks a proper factual foundation is little more than "unscientific speculation offered by a genuine scientist," and thus is both unreliable and inadmissible. *Rosen v. Ciba–Geigy Corp.,* 78 F.3d at 316, 318 (7th Cir.1996).

#### 2. Analysis

The Court has carefully reviewed the evolution of Dr. Nine's opinions from his initial expert letter report of March 11, 1996, through his trial testimony, and is forced to conclude that Dr. Nine's testimony is unreliable given its lack of an adequate factual foundation. Simply stated, much of Dr. Nine's testimony, and particularly his ultimate conclusion that the Defendant was responsible for the fire that damaged the Plaintiff's house, is not based upon any particular evidence or trained observation, but represents mere subjective belief and unsupported speculation. The following is illustrative of the point.

### A. Dr. Nine's Deposition Testimony

■ As explained *supra*, Dr. Nine testified at trial that in his opinion a voltage surge occurred on February 4, 1996, which immediately caused the insulation on the wires inside the panel distribution box to fail, which in turn immediately led to an arcing condition between the exposed wires and the metal panel distribution box, causing the fire. 8/12/98 at 65, 78. However, Dr. Nine testified quite differently in his deposition on December 10, 1997:

> And *the damage was not sufficient at the time of the power surge to cause an immediate breakdown of the insulation, but over a period of a couple of days we had enough damage that it broke down.* And once it did, we have an avalanche of current flowing through the damaged insulation and that heats up the insulation around it and causes the wire to then make positive contact, total contact with the panel.

Nine dep. at 20–21 (emphasis added).

At trial Dr. Nine attempted to explain this glaring temporal discrepancy between his deposition conclusion that it took two days for the insulation to break down, and his trial conclusion that it occurred immediately, by stating that just before his deposition he had been told that the voltage surge had occurred on February 4, but that he was then incorrectly informed that the fire occurred two days later, on February 6. 8/12/98 at 109–111. Dr. Nine went on to explain that he concluded in his deposition that the voltage surge did not immediately cause the insulation to break down so as to be "consistent" with his then-held belief that the fire had occurred two days after the voltage surge. 8/12/98 at 111–12.

This episode hardly inspires confidence in the intellectual rigor Dr. Nine applies to his work, let alone his ultimate opinions. Rule 702 and *Daubert* demand that an expert's specialized testimony have a reliable factual or scientific basis, and it naturally follows that an expert must be able to point to some reliable scientific or factual basis to support any significant change in his specialized testimony. *Cf. Kumho,* 526 U.S. at ——– ——, 119 S.Ct. at 1174–75. However, Dr. Nine's abrupt shift in testimony as to the length of time between the voltage surge and the fire was based on nothing more than being told when the fire occurred, not any particularized fact or observation. Indeed, one marvels at the breath-taking ease with which Dr. Nine offers his "expert" opinions, surpassed only by his apparent ability to change them based on nothing more than the mere suggestion of counsel. With such an approach, unshackled as it is to any sort of factual, scientific or technical analysis, Dr. Nine's testimony easily accommodates whatever theory or time interval is needed by his client. Unfortunately, of course, Dr. Nine's trial testimony on this whole point is simply unreliable given the absence of any factual or technical basis for either offering or changing his initial sworn testimony. In sum, the fact that Dr. Nine initially concluded that the fire did not occur immediately after the voltage surge so as to be "consistent" with a fire occurring on February 6, yet later testifying at trial that the fire occurred immediately after the voltage surge (since by then he knew that the fire had occurred on February 4), demonstrates that all of his testimony on this point is nothing more than unscientific speculation offered by a so-called expert; in short, mere *ipse dixit.*

### B. The Alleged Loose Neutral

■ Dr. Nine made very clear in his trial testimony that he believed the voltage surge was caused by a loose neutral connection on the transformer that served the Plaintiff's house. In fact, Dr. Nine specifically testified that the neutral came loose at a connection, and that the neutral could not have been broken because the other homes served by that transformer had electrical power the day after the fire. *See* 8/12/98 at 126–27; 143–45. However, there is no factual basis in the record to support a conclusion that the neutral con-

nection ever became loose, much less that it became loose on the day of the fire.

Dr. Nine testified that "the first evidence" he reviewed which indicated that the neutral connection was loose was the documentation pertaining to the February 6 service call that responded to a bright/dim lights call at 412 Westwood Drive, a house serviced by the same transformer as the Plaintiff's house. 8/12/98 at 75 ("And that was the first evidence I had seen that they had a loose neutral problem. Before that time, there was no physical evidence whatsoever that there was a problem with the loose neutral."); see also Pl. Tr. Exh. 27.[8] However, a close inspection of the relevant documents reveals that the February 6 service call pertained to a *broken* neutral, not a *loose* neutral. See Pl. Tr. Exh. 27 at 2 (answer to Inter. # 3, "Found and repaired broken primary secondary neutral conductor to line behind house"); *id.* at 3 (answer to Interog. # 6, same); *id.* at 8 (Daily Crew Plan/Report/Time Sheet for 02/06/96, "Bright & Dim Lts, 412 Westwood, Prim. Neut. Broke"); *id.* at 17 (same).[9]

This is apparently the sum total of the documentation Dr. Nine relied upon when he somehow concluded that the neutral must have been loose, but not altogether broken, on February 4.[10] Left unexplained in all this is how a broken neutral on February 6 supports the conclusion that the neutral was only "loose" two days earlier. To be blunt about it, Dr. Nine's conclusion that the neutral was loose on

February 4 is mere unvarnished speculation, and certainly has no reliable factual basis.

Indeed, close scrutiny of Dr. Nine's trial testimony supports this conclusion. When challenged on cross-examination, Dr. Nine acknowledged that he had no first hand knowledge that the neutral was loose on February 4, but countered by stating that the neutral "could have been loose," a position he went on to characterize as "a supposition based on the events." 8/12/98 at 127. Although Dr. Nine did not elaborate on the specifics of the "events" to which he referred, we presume that this relates to his knowledge that "the other four homes on the service still had electrical service without any problems, the day after the fire." 8/12/98 at 126. From this fact, Dr. Nine opined that "the day of the fire and the day after the fire that neutral connection would have still had to have been there. So it could not have been broken loose to the point where it would have been observed." *Id.*

Dr. Nine's speculation that the neutral "could have been loose" because the electrical service to the other four houses was not permanently disrupted after the fire certainly did not require any application of Dr. Nine's specialized skills. Indeed, this conclusory supposition is nothing more than a bottom line conclusion, and thus does not pass muster under Rule 702 and *Daubert. See Mid–State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies

---

8. Pl. Tr. Exh. 27 includes the Defendant's answers to several interrogatories propounded by the Plaintiff, as well as several documents provided by the Defendant in response to related requests to produce. Unfortunately, this exhibit is not separately paginated. In the interest of clarity, the Court will refer to the particular pages within the exhibit according to their order, i.e., the first page will be cited as Pl. Tr. Exh. 27 at 1, the second page will be cited as Pl. Tr. Exh. 27 at 2, etc.

9. The conclusion that the February 6 service call had nothing whatsoever to do with a loose neutral is supported by the trial testimony of Mike Bennett, the lineman who made

the February 6 service call (and who also climbed the utility pole to cut the electrical power to the Plaintiff's house after the fire). Bennett testified that on February 6 the neutral wire itself broke "right in the middle of the line," not at a connection, which he attributed to the cold weather. 8/12/98 at 170, 174.

10. Q: Did you have any information, Mr. Nine, that's not contained in the documentation that was provided by [the Defendant]?

A: No.
8/12/98 at 135.

nothing but a bottom line supplies nothing of value to the judicial process."); *accord Huey v. United Parcel Serv.*, 165 F.3d 1084, 1087 (7th Cir.1999); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067–68 (7th Cir.1998); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir.1997); *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318–19 (7th Cir.1996).

In short, Dr. Nine first concocted a liability theory (the loose neutral), and then went in search of facts to support it; finding no facts, he tried to plug the gap with "a supposition," all with a view to providing the jury with an unsupported bottom line conclusion.

### C. THE SIGNIFICANCE OF THE ALLEGED LOOSE NEUTRAL

██ Even if it were possible to credit Dr. Nine's opinion that a loose neutral connection occurred on the day of the fire, we would still find his testimony to be unreliable due to his contradictory assertions as to the significance of the loose neutral. In his March 30, 1998, affidavit, which the Plaintiff relied upon in opposing summary judgment, Dr. Nine asserted that he had "discovered" from an examination of the documentation relating to the February 6 service call that the Defendant had "found and replaced a broken primary/secondary neutral conductor" on the same transformer that serviced the Plaintiff's residence. Nine aff. ¶ 17. According to Dr. Nine's affidavit, "[t]his condition is consistent with excessively high voltage in that such excessive voltage *can cause the expansion of the splice connector leading to the resulting failure or loosening of the neutral.*" *Id.* (emphasis added). In other words, Dr. Nine asserted in his affidavit that the voltage surge caused the neutral to become loose.[11]

In contradistinction, Dr. Nine's trial testimony rested on the theory that the allegedly loose neutral caused the voltage surge, not the other way around. *See* 8/12/98 at 75–78. This abrupt and inexplicable about-face simply underscores the notion that Dr. Nine's trial testimony as to the significance of the allegedly loose neutral was nothing more than rank and unsubstantiated speculation.

### D. THE ALLEGED EQUIPMENT PROBLEM IN THE DISTRIBUTION SUBSTATION

After his deposition Dr. Nine reviewed various weather, fire, and police incident reports to determine if any incident, such as a lightning strike or a damaged power line, could have caused the alleged voltage surge. Finding none, Dr. Nine nevertheless opined in his supplemental letter report of January 26, 1998, that the probable cause for the voltage surge was an equipment problem in the distribution substation. *See* Pl. Tr. Exh. 22 at 2. However, at trial Dr. Nine admitted that he had no evidence that there was an equipment problem at the distribution substation when he wrote his supplemental letter report. 8/12/98 at 122–23. In other words, Dr. Nine admitted under oath that he lacked any reliable factual basis for concluding in his supplemental letter report that the voltage surge was caused by an equipment problem, despite knowing that this report would be provided to the Court. 8/12/98 at 122. Although Dr. Nine did not ultimately rely upon this theory at trial, this demonstrated willingness to unabashedly offer conclusions that he knows lack factual, technical, or scientific support, (but which are curiously always favorable to his client), suggests that Dr. Nine's malleable "expert" testimony was not subjected to "the same level of intellectual rigor that characterizes the practice of an

11. In his opposition to the Defendant's motion in limine, the Plaintiff argued that the February 6 service call was relevant to this case because "[a] report of excess voltage near [Plaintiff's] residence shortly after the fire is relevant as to whether there was continuing excess voltage in the transformers in the area and/or whether excess voltage was commonplace." Pl. Resp. to Def. Mot. in Lim. at 2 (Docket # 54). Dr. Nine made no mention as to the importance of "excess voltage" at trial.

expert in the relevant field." *Kumho Tire,* 526 U.S. at ——, 119 S.Ct. at 1176; *see also McMahon v. Bunn–O–Matic Corp.,* 150 F.3d 651, 658 (7th Cir.1998) ("No engineer would put such an unsupported assertion in a scholarly article; . . . we doubt that [Dr. Nine] would accept it from a student in a term paper. Why, then, should courts pay it any heed?").

### E. DR. NINE'S CONCLUSION AS TO THE CAUSE OF THE FIRE

■ Finally, when asked to relate the voltage surge caused by the alleged loose neutral to the fire in the Plaintiff's residence, Dr. Nine testified as follows:

> Well, the [Plaintiff's] residence had very little connected to the power system, since they were—since there was no one in the home, and so all of the—all of the residences connected to the transformer would see the same voltage surge. *But it just so happened that the [Plaintiff's] residence, the insulation at the [Plaintiff's] residence was the weakest of anyplace and it caused the failure of the insulation at the [Plaintiff's] residence.* And just the damage to the other things that were on in the other residences.

8/12/98 at 77–78 (emphasis added). Thus, Dr. Nine's ultimate conclusion rested in large part, if not entirely, upon his assertion that the insulation protecting the wires inside the panel distribution box in the Plaintiff's house was weaker than the insulation protecting the wires inside the

panel distribution boxes of the other four houses connected to the transformer.

However, at no time did Dr. Nine ever explain how it was he knew that the Plaintiff's insulation "just so happen*ed*" to be weaker than the insulation in any of the other four houses serviced by the same transformer, or even how he could draw such an inference.[12] In fact, Dr. Nine testified that he had never done any testing to determine how many volts it would actually take to break down the insulation in the Plaintiff's distribution panel box, and that he had "no way of making [the] determination" of how much voltage it would take to burn through the insulation on those wires. 8/12/98 at 132. Therefore, Dr. Nine had no factual, technical, or scientific basis for concluding that the insulation protecting the Plaintiff's wires "just so happened" to be "weaker" than the insulation protecting any of the neighbors' wires, which renders his ultimate conclusion as to why the fire occurred in the Plaintiff's house fundamentally flawed and unreliable.

### 3. Conclusion

The opinions Dr. Nine has proffered throughout this litigation,—through his deposition testimony, letter reports, affidavit, and finally his trial testimony—are generally lacking in factual support, sometimes inexplicably contradictory, and occasionally devoid of any plausible rationale. It is unfortunate for all concerned that these fatal deficiencies were not fully appreciated until after trial.[13] Nevertheless, having

---

12. In fact, the Court alluded to this very point in addressing the Defendant's motion for judgment of law at the close of the Plaintiff's case in chief:
> . . . [a neighboring] house had some, in essence, items that were damaged, garage door openers, TV's, et cetera. And then the [Plaintiff's] house burns down. And when we look at that as somewhat inexplicable, except that the testimony is that the [Plaintiff's] insulation was weaker. Well, I don't know that anyone tested the Tanner insulation, vis-a-vis the [Plaintiff's] insulation. So where do we get that? Where do we get that? That there's Dr. Nine's testimony that the insulation was weaker. Query as

to whether or not he is authorized to—capable of making an opinion or offering an opinion as to that point, although, it may be a reasonable inference.
> 8/12/98 at 155–56.

13. However, this is somewhat understandable given that neither the Court nor the Defendant were made aware that Dr. Nine would testify that the "loose neutral" was the cause of the voltage surge until the day before trial. *See* 8/12/98 at 10 ("I must say it's somewhat of a new wrinkle in the sense that the first I heard about a broken neutral was, I think, two days ago."); *see also id.* at 16, 22, 26–28.

now had an opportunity to thoroughly review the entire record, we find that Dr. Nine's "expert" trial testimony lacked an adequate factual, technical, or scientific foundation. Opinions without factual support are nothing more than the subjective belief and unsupported speculation—the *ipse dixit*—of the witness, and therefore Dr. Nine's testimony does not meet the reliability test of *Daubert* and Rule 702. *See, e.g., Joiner,* 118 S.Ct. at 519; *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795.

### C. Relevance

■ Even assuming, *arguendo,* that Dr. Nine's testimony is reliable, we would still conclude that his testimony should be excluded under the second prong of the *Daubert* analysis, which requires us to determine whether the testimony would assist the trier of fact in determining a fact in issue in the case. The central issue that the jury was asked to determine was whether the Defendant was liable for the fire because the electricity it supplied to the Plaintiff's house was "in a defective condition unreasonably dangerous to the consumer or user." *See* Court's Final Instruction Nos. 20, 23–25; Ind.Code § 34–20–2–1 (1998);[14] *see also Anderson v. P.A. Radocy & Sons, Inc.,* 67 F.3d 619, 625 (7th Cir.1995) ("Indiana's definition of 'defect' is similar to what is commonly referred to as the consumer expectation test.").

Indiana courts have not yet had any occasion to rule when, or in what form, electricity should be considered "defective," but other courts applying the "consumer expectation test" to electricity have developed a general rule that electric voltage is dangerously defective when it is far in excess of the level intended by the utility and expected by the consumer. *See generally Bryant v. Tri–County Electric Membership Corp.,* 844 F.Supp. 347, 350 (W.D.Ky.1994) (electric voltage is dangerously defective when it is far in excess of the level intended by the utility and ex-

pected by the customer); *accord Pierce v. Pacific Gas & Elec. Co.,* 166 Cal.App.3d 68, 212 Cal.Rptr. 283, 287 (1985) ("It goes without saying that 7,000 volts was far in excess of [defendant's] intended result and in excess, as well, of plaintiff's reasonable expectations."); *Ransome v. Wisconsin Elec. Power Co.,* 87 Wis.2d 605, 275 N.W.2d 641, 649 (1979) (current of 4800 volts flowing into a house is unreasonably dangerous because the circuit breakers used by ordinary consumers cannot protect homes from currents in excess of 600 volts).

Conversely, courts have indicated that electricity is not defective when a voltage variance in a home is minimal, or when the homeowner is in a better position to control the variance than the electric company. *See Bryant,* 844 F.Supp. at 350 n. 7 (opining that 500 volts might not be unreasonably dangerous because currents up to 600 volts could be controlled most economically by the homeowner); *Elgin Airport Inn, Inc. v. Commonwealth Edison Co.,* 89 Ill.2d 138, 59 Ill.Dec. 675, 432 N.E.2d 259, 261–62 (1982) (holding that the electricity provided was not unreasonably dangerous when the voltage surge varied only minimally from the normal current, and the plaintiff, rather than the defendant, was in the better position to mitigate the higher then usual voltage).

■ These opinions are consistent with Indiana's standard for obtaining property damages in a products liability action, where such recovery is limited to "sudden, *major*" damage. Ind.Code § 34–6–2–105 (1998) (emphasis added) (formerly Ind. Code § 33–1–1.5–2). Under this statute " '[m]ajor' is defined as 'greater in number or extent, notable or considerable in effect or scope or involving grave risk,' which connotes some qualitative relationship, either in number or extent, to the damage." *Reed v. Central Soya,* 621 N.E.2d 1069,

---

14. Indiana recodified its statutes governing product liability actions on July 1, 1998. The recodification did not work any substantive changes in the law, and for convenience we shall refer to the present codification.

1075–76 (Ind.1993) (quoting WEBSTER'S THIRD NEW INT'L UNABRIDGED DICTIONARY (1976)); *see also Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1088–89 (Ind.1993) ("In *Reed* we examined the meaning of 'sudden, major' damage and concluded that where recovery for property damage is sought under the Act, such damage must have happened quickly, unexpectedly, and be of a calamitous nature."). The issue of whether property damage is sudden and major is generally one of fact. *Reed v. Central Soya Co. Inc.*, 644 N.E.2d 84, 86 (Ind.1994). Nevertheless, we believe that as a matter of law no reasonable jury could conclude that the damage caused by a surge of several thousand volts into a home as in the *Pierce* and *Ransome* cases is not "major" or of a "calamitous nature." On the other hand, no reasonable jury could conclude that minimal damage to electric appliances caused by a relatively minor voltage fluctuation would be "major" or "calamitous," under Indiana law.

Against this backdrop we must conclude that Dr. Nine's testimony did not assist the jury in determining whether the electricity supplied by the Defendant was unreasonably dangerous. Importantly, Dr. Nine testified that the level of the voltage surge was identical for all five houses serviced by the transformer with the allegedly loose neutral. 8/12/98 at 78. This fact creates what the Court termed an "interesting dichotomy," in that this level of voltage only damaged electrical appliances in some of the homes, but somehow supposedly caused a fire in the Plaintiff's home. *See* 8/12/98 at 156. As detailed *supra*, Dr. Nine's explanation for this dichotomy was that "it just so happened" that the insulation protecting the wires in the Plaintiff's house was weaker than the insulation on the wires in the other houses, and therefore the insulation on the Plaintiff's wires broke down but the insulation in the other houses did not. 8/12/98 at 78. But what did this speculation really tell the jury? In essence it informed them that the fire would not have occurred at all—i.e., that the damage to the Plaintiff's house would not have been "major" or "calamitous," but merely limited to electrical appliances as in the other houses—if the insulation protecting the wires in the Plaintiff's house had been stronger! In other words, Dr. Nine's speculation as to the relative strengths of the insulation actually laid the blame for the fire at the feet of the Plaintiff, not the Defendant. *See Elgin*, 59 Ill.Dec. 675, 432 N.E.2d at 261–62 (electricity is not unreasonably dangerous when the plaintiff, rather than the defendant, is in the better position to mitigate higher then usual voltage). Consequently, Dr. Nine's testimony could not possibly have assisted the trier of fact in determining that the electricity provided by the Defendant was unreasonably dangerous, and therefore was not relevant to the issues about which Dr. Nine testified. *See, e.g., Daubert*, 509 U.S. at 590–91, 113 S.Ct. at 2795–96.

To summarize, Dr. Nine's testimony is not reliable because it lacks adequate factual support. Furthermore, Dr. Nine's testimony is not relevant because it could not have helped the jury determine that the Defendant was responsible for the fire that occurred in the Plaintiff's residence. Therefore, Dr. Nine's testimony fails to meet the requirements of Fed.R.Evid. 702 and *Daubert*, and will not be considered by the Court in ruling on the Defendant's motion for judgment as a matter of law.

## V. THE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

█ The only other evidence aside from Dr. Nine's testimony that the Plaintiff points to as supporting the jury's verdict is the testimony of John Tanner, a neighbor of the Plaintiff at the time of the fire whose house was also serviced by the same transformer as the Plaintiff's. The relevant portion of Tanner's testimony pertained to a conversation Tanner had the day after the fire with several employ-

ees of the Defendant who were working on the transformer behind the Plaintiff's house:

> A: They were out in there—between [Plaintiff's] and my house there is a telephone pole right on the line . . . And there was a transformer out there and they were working back there. . . .
>
> \*   \*   \*   \*   \*   \*
>
> Q: Did you have occasion to talk to the . . . employees?
>
> A: Yes. I walked out there to see what they were doing. They told me they were repairing the ground on the high tension, higher voltage line.
>
> Q. Did they tell you specifically what they were repairing?
>
> A: Yes, the ground.
>
> \*   \*   \*   \*   \*   \*
>
> Q: Can you tell the Court and the jury the conversation that you had with these employees?
>
> A: Well, I asked—they told me the ground broke. And I said what happens when the ground broke? They said the tension line tries to find a ground as quick as it could. And he said, "You're two houses—you're the closest, so it went to your house first." So, and I said, "Well, my things were broken and I didn't know what was wrong." And he said, "Well, it was—probably came through when that line broke."
>
> Q: Did any employee . . . tell you that a power surge had gone into any of the homes in the area?
>
> A: Yes. He said that a power surge happen [sic] when the ground broke.
>
> \*   \*   \*   \*   \*   \*
>
> Q: Did you have any specific conversations with the . . . employees concerning what happened as a result of the ground being broken?
>
> A: Only that it sends a—the voltage seeks a lower level, the ground someplace. And my house is double grounded, so it didn't do any damage to my house that much, only the low-voltage things.

8/11/98 at 143–46. On cross-examination, Tanner stated that the linemen did not tell him when the ground broke, or when the surge went through. 8/12/98 at 148.

Taken in a light most favorable to the Plaintiff, this testimony establishes only that a ground wire broke on the transformer that serviced the houses of Tanner and the Plaintiff, and that this event caused a voltage surge. However, this testimony does not speak to the real question, which is not whether a voltage surge occurred, but whether the level and extent of the surge rendered the electricity supplied to the Plaintiff's house unreasonably dangerous. On this point, Tanner's innocuous testimony fails to support a reasonable inference that the voltage surge was of a sufficient level to cause the Plaintiff's insulation to fail, particularly since the surge did not apparently cause insulation failure in any of the other houses serviced by that transformer. Consequently, no reasonable jury could have found for the Plaintiff based upon Tanner's testimony alone, and there being no other evidence in support of the verdict, the Defendant's motion for judgment as a matter of law must therefore be granted. *See Deimer,* 58 F.3d at 345 (granting defendant's motion for judgment as a matter of law after plaintiff's expert evidence was excluded).

## VI.  CONCLUSION

For all the reasons provided, Dr. Nine's testimony was inadmissible under Fed. R.Evid. 702 and *Daubert,* and should have been excluded from the jury's consideration. The remaining evidence was insignificant to support the jury's verdict, and therefore the Defendant's motion for judgment as a matter of law is GRANTED. The Clerk is directed to enter judgment for the Defendant and against the Plaintiff.

SO ORDERED.