*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-676

JEROME C. LEWIS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2013-CF1-2826)

(Hon. Milton Lee, Trial Judge)

(Argued January 28, 2021                    Decided December 2, 2021)

*Deborah A. Persico* for appellant Lewis.

*Anne Y. Park*, Assistant United States Attorney, with whom *Timothy J. Shea*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Michelle D. Jackson*, and *Kimberley C. Nielsen*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge*.

GLICKMAN, *Associate Judge*: Jerome Lewis appeals his convictions after a jury trial of first-degree felony murder with aggravating circumstances, the underlying felony of first-degree cruelty to children, and second-degree murder as a

lesser included offense of the charge of first-degree felony murder (arson). (The jury acquitted appellant of arson and of first-degree felony murder predicated on that felony.) These charges were based on evidence that appellant set a fire in the basement of his house in the middle of the night — a fire that filled the upper floors with smoke and resulted in the death from smoke inhalation of a four-year-old child. Appellant's principal claim is that the trial court erred by admitting unreliable expert testimony as to the origin and cause of the fire. He also asserts that the court erred by refusing his request to instruct the jury on civil negligence; that the evidence at trial was not sufficient to support his murder and child cruelty convictions; and that the court erred by denying his motion for a new trial in the interests of justice. We are not persuaded by appellant's arguments, and we affirm his convictions.

### I. The Evidence at Appellant's Trial

This appeal is from a retrial held after the jury could not reach a verdict on the main counts at issue in appellant's first trial, which was in 2016. Although the jury in that first trial found appellant guilty of one count of threats to do bodily harm, he does not challenge his threats conviction. In what follows, therefore, we summarize only the pertinent evidence presented by the government at the retrial. Appellant presented no evidence at that trial.

## A. Factual Background

Appellant owned and resided in a house located at 2616 33rd Street in Southeast Washington, D.C. He occupied the basement of the house and rented the upper floors to his cousin Shirley Jenkins-Holland, her husband Alex Holland, their adult daughters Sarah and Alexis, and Sarah's two young children, S.M.J. and M.J. There was a stairway down to appellant's basement apartment from the first floor kitchen area. The basement also had a door opening to the backyard. In the basement, appellant had his own kitchen and his private living space. He slept on a mattress there. Shirley testified that appellant had "basic linen" (i.e., a cotton or polyester "sheet") and a fleece blanket or cover on the mattress; she could not say exactly what material the sheet and blanket were made of. Alexis also recalled the blanket on appellant's mattress but did not know whether it was made of cotton or a synthetic material.

Initially, appellant got along well with the Jenkins-Holland family and spent considerable time socializing with them upstairs. The two young children, S.M.J. and M.J., were fond of appellant and frequently visited him in his basement apartment.

Over time, however, appellant's relations with the family deteriorated. Appellant complained about their failure to pay the bills and the odor of the seasonings the family used in cooking their meals. To prevent the unpleasant cooking smell from bothering him in the basement, appellant put up a plastic tarp from the ceiling to the floor at the top of the stairs leading down from the first-floor kitchen.

The government presented evidence that, by 2013, appellant was in need of money. His primary source of income was the rent he received from the Jenkins-Holland family and from the tenants of a second house he owned, which amounted in total to only about $1800 a month. On three occasions between January 2012 and January 2013, appellant sought to borrow money from family members to finance two trips he took to Africa. One of those family members, appellant's uncle, testified to his impression that appellant's financial situation in 2012 was tenuous and that he needed money in a hurry because he spent it as soon as he got it. When appellant returned home in January 2013 from his second trip to Africa, he said he had found a wife there and asked the Jenkins-Holland family to move out. Shirley and Alex told appellant they could not afford to move out immediately. He agreed to give them six months and to lower their rent by $200 a month to enable them to save some money.

## B. The Fire

A month later, on February 16, 2013, Sarah and Shirley noticed the curious fact that appellant had removed his television and his father's military burial flag from the basement and left those items outside in the backyard. That night, Alexis and Shirley put the children down to sleep and then went to bed. (Shirley's husband Alex was out of town.) Shortly after 3:00 a.m., Alexis was awakened by smoke filling her room on the second floor. She ran to the children's room. However, only M.J. was there; four-year-old S.M.J. had gone to sleep in her grandmother's room. Alexis took M.J. and went to wake up Shirley, who immediately ran down to the first floor bedroom to awaken Sarah and her boyfriend. Shirley saw smoke but no fire on the first floor until she opened the door that led to Sarah's bedroom and the basement stairwell. At that point, Shirley saw fire coming up the stairs from the basement, and the plastic tarp appellant had hung at the top of those stairs was engulfed in flames. Blocked by the fire from reaching Sarah's bedroom, Shirley screamed for her to wake up. Alexis, who ran down the stairs with M.J. to join Shirley, also saw flames coming from the basement. Alexis did not see fire in any other room. Screaming at her mother to "come on," Alexis, Shirley, and M.J. went out the front door of the house. The door shut behind them and automatically locked.

Alexis then realized S.M.J. was still somewhere inside the house, but she did not have a key to get back inside.

Sarah was awakened by her mother's screams. She smelled the smoke and ran to her door. When she opened it, she saw the fire moving toward her from the basement and the tarp at the top of the stairwell. Sarah sustained second-degree burns to her arms, shoulder, and back. She woke up her boyfriend and they jumped out their bedroom window into the backyard.

There Sarah saw appellant standing and facing the house, silently watching the fire. He was calm, smoking a cigarette, and fully dressed. He had not alerted anyone in the house to the fire and he ignored Sarah and her boyfriend's narrow escape. Sarah ran to the front of the house, where she found Shirley, Alexis, and M.J., and realized S.M.J. was still inside the home.

At about 3:15 a.m., Metropolitan Police Department (MPD) Officer Mark Abbey saw smoke coming from the vicinity of appellant's house and went to investigate its source.[1] As he neared the house, Officer Abbey heard a man pacing

---

[1] Officer Abbey first noticed the smoke while he was watching a security camera in a guard booth at the home of then-Mayor Vincent Gray, which was located behind appellant's house.

in the darkness and muttering to himself. The officer called out and asked if everything was all right. The man, whom Officer Abbey could not see, answered in a calm voice that "everything's fine." Officer Abbey did not believe it and ran back to get his flashlight. When he returned, he saw flames coming from the basement of appellant's house and appellant pacing and muttering in the backyard. Officer Abbey recognized appellant's voice as that of the man in the alley who told him everything was fine.

Video footage from a surveillance camera located in the alley behind appellant's house was introduced at trial. In addition to corroborating Officer Abbey's account of his arrival at around 3:15 a.m., the footage showed earlier activity by someone, presumably appellant, opening and closing the basement door and moving around outside the house at various times between 1:17 a.m. and 2:34 a.m., followed by smoke and fire coming from the basement door at 3:12 to 3:13 a.m.

Officer Abbey called the fire department and went to the front of the house, as did appellant. Other MPD officers arrived on the scene. One of them, Officer Mario Barr, testified that he saw appellant standing in front of the house, mumbling

to himself, while Sarah hysterically yelled that her child was inside. The officers kicked in the front door, but there was so much smoke that they could not enter.

Shirley screamed at appellant, "[Y]ou burned our house down," and he responded, "I'm going to kill you, bitch." Upon hearing that S.M.J. was still in the house, appellant climbed on the roof and attempted to enter by a window, but the smoke prevented him. After another confrontation with Shirley, in which he again threatened to kill her and attempted to kick and elbow her, the police arrested and searched appellant. In his front pocket, they found a half-used book of matches. During a later search of the basement, police recovered a pack of Kool cigarettes and a receipt from a nearby gas station for two packs of Kool cigarettes purchased with appellant's credit card at 1:48 a.m. on the morning of the fire.

Firefighters eventually found S.M.J. lying unconscious in an upstairs bedroom. The child was hospitalized and treated for second-degree burns and smoke inhalation. She succumbed to her injuries two days later.

While appellant was detained at the D.C. Jail following his arrest, he spoke with friends about the fire during visits and phone calls. His conversations were recorded. In them, appellant claimed there had been two separate, unrelated fires — one on his mattress in the basement and the other upstairs in the first-floor kitchen

— and he denied being responsible for the latter. In one conversation, appellant suggested that the fire on the mattress was the result of an accident, because "you know . . . people fall asleep plenty of times with a cigarette burning." This fire could not have caused the upstairs fire, appellant said, because he "had turned the water on" and "the whole carpet was wet" so he "knew the mattress couldn't have caught on fire like that." In a conversation with another friend, appellant admitted that he was burning the mattress and that he watched it burn:

> I'm watching what I'm burning. I'm literally watching what I'm burning. No sooner as it got to a point and I was like, I'm gonna go ahead and take it out because I was just going to use the fire extinguisher, but then I'm just going to take it outside the house . . . . No sooner as I walked, walked past the vents, that's when all this other toxic smoke started coming from the vents. You know, plastics, and all of it. You know, plastic burning, you know that's a toxic smell as opposed to just . . . cotton.

Consequently, appellant said, he "didn't get a chance to throw nothing outside" and his "mattress never made it out the house."

During one visit, on April 4, 2013, appellant proposed a scheme, requiring his friend's assistance, to submit an inflated insurance claim for the repairs on his home. "[W]ork with me," appellant said, "so that way I can come out with a little bit of

money." Appellant outlined how his friend could get "in on the contract" and "get a piece of that money" too, "so we all can eat."

## C. Investigation of the Origin and Cause of the Fire

Investigation of the fire's origin and cause began at 5:00 a.m. on February 17, 2013. Special Agent (SA) Chad Campanell, a fire investigator with the Bureau of Alcohol, Tobacco, and Firearms (ATF), arrived that morning to assist the D.C. Fire Department with the investigation. SA Campanell personally examined the fire damage and took photographs to document it. He observed that the most severe fire damage was in the basement, with some in the rear of the first floor (near the stairs to the basement). There was no fire damage on the second floor. SA Campanell inspected the electrical fixtures, outlets, and such, and found no evidence that the fire was electrical in origin.

SA Campanell recruited Lee McCarthy, a fire investigator at the ATF's Fire Research Lab, to assist the investigation and to perform tests to determine whether an accidentally dropped cigarette could have caused the fire by igniting the bedding material and mattress in the basement (as appellant had suggested). McCarthy reviewed photographs, documents and reports, including witness statements, and other evidence collected in the case, and he personally inspected the house in January

2014. The trial court accepted McCarthy as an expert in determining the origin and cause of fires and in fire protection engineering. His report was admitted in evidence.

Based on the pattern of damage he observed, his understanding of fire dynamics and behavior, and the statements of witnesses and appellant himself, McCarthy concluded that the fire originated in the basement, the site of the greatest fire damage. From there it flowed up the stairwell, which itself was considerably burned. On the first floor, the severity of the damage correlated with its proximity to the stairs to the basement. The worst damage in the basement was in the living space: the fire almost entirely consumed the furniture, and metal springs were all that remained of the mattress. McCarthy concluded there was no second fire starting on the first floor (contrary to appellant's claim to his friends).

In McCarthy's opinion, "the most data" (including appellant's own statements) supported the mattress as being where the fire originated.[2] Finding no

---

[2] There were some signs, however, that fires might have been started at other spots in the basement as well. McCarthy could not rule out that possibility. If so, McCarthy noted, that in itself was evidence the fire was intentionally set. *See United States v. Aman*, 748 F. Supp. 2d 531, 535-36 (E.D. Va. 2010) (citing the National Fire Protection Agency's Guide for Fire and Explosion Investigations (2008 ed.) ("NFPA 921") for the proposition that "multiple, non-communicating fires are more

evidence for an electrical cause of the fire, McCarthy narrowed the potential ignition sources to either an open flame such as a match or a lighter or, conceivably, a lit cigarette that had fallen on the bedding.

McCarthy testified that it is relatively hard to start a fire in a mattress, because federal safety regulations require mattresses to be made from fire retardant materials with a low burning rate in order to increase escape time. An open flame deliberately held to a bare mattress long enough could ignite it, but one would not expect a dropped cigarette alone to do so.[3] However, a cigarette might ignite bedding material on top of a mattress, such as sheets and blankets, which in turn could suffice to set the underlying mattress on fire. McCarthy therefore planned and conducted testing to determine the conditions under which a smoldering cigarette might have ignited the bedding material on appellant's mattress, and how long that would take.

To do so, McCarthy conducted a literature review, developed a testing protocol with other engineers at the ATF Fire Research Lab, and had his peers there

---

likely to be incendiary — that is, intentional — fires because, quite logically, accidental fires do not ordinarily start simultaneously in multiple places").

[3] SA Campanell gave similar testimony. He said he had ignited many beds, and that it was very difficult to do so with a cigarette ("an unreliable ignition source," in his words).

review his protocol and help him conduct the tests. In formulating his testing protocol for ignition of the bedding material, McCarthy relied on witness statements that appellant had some type of fleece blanket and a sheet on a Sealy Posturepedic mattress purchased in 2010, and that Kool cigarettes had been found in the basement. McCarthy therefore conducted testing with Kool cigarettes on Sealy Posturepedic mattresses.

His procedure had two phases. In the first phase, because McCarthy did not know the exact composition of the bedding fabric, he tested three different types — all cotton; all synthetic; and a 50/50 cotton and synthetic blend. McCarthy conducted twenty experiments, and within each experiment, he tested fifty samples, for a total of 1,000 tests of ignition via cigarette. In the first ten experiments, McCarthy used the same material but varied the physical configuration of the bedding on the mattress. In the next ten experiments he used forced air to observe the effect of variable airflow across the surface of the bedding.

The results of the first phase of testing were as follows: (1) None of the synthetic materials transitioned into flames. (2) Only the 100% cotton material sustained smoldering. (3) The 100% cotton material was more likely to smolder when it was in a crumpled configuration. (4) In the 1,000 tests conducted, only two

samples of the 100% cotton bedding transitioned from smoldering fire to flaming fire.

In the second phase of testing, McCarthy conducted 100 additional experiments with all cotton bedding. He tested the cotton bedding at different thicknesses and in different configurations. His tests showed that: (1) a double sample (e.g., blanket plus sheet) was more likely to ignite than a single sample; (2) a crumpled configuration was more likely to ignite than a flat configuration; and (3) forced airflow increased the likelihood of ignition.

In the 1100 tests conducted, the mattress ignited only twenty times. In those instances, it took between 3 and 28 minutes for flaming combustion to occur; the average time was 12 minutes.

Based on his testing and the evidence, including appellant's own statement that he watched the mattress burn, McCarthy opined that the cause of the fire was "either a cigarette dropped onto some cotton material" or an open flame. Either way, McCarthy classified the fire as incendiary, "meaning an intentionally-set fire," rather than accidental or undetermined. He reasoned that if the cause was a dropped cigarette, his tests showed there would have been ample time for someone aware of it to extinguish the fire before it grew out of control, so the failure to put out the fire

in that case indicated it was no accident. Whereas, if the cause was an open flame like a match or lighter, that indicated someone held the flame to the mattress (or bedding) long enough to ignite it, indicating the fire was set deliberately.

## II.    Legal Analysis

### A. Admission of the Expert Testimony

In October 2016, in *Motorola Inc. v. Murray*,[4] this court abandoned the *Dyas/Frye* "general acceptance" test governing the admissibility of expert testimony.[5] In its stead, we adopted the reliability-based standards of admissibility set forth in Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[6]

Rule 702 imposes five distinct conditions on the admission of expert testimony. The trial judge must be satisfied that (1) the witness is qualified as an

---

[4]  147 A.3d 751 (D.C. 2016) (en banc).

[5]  *See Dyas v. United States*, 376 A.2d 827 (D.C. 1977); *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[6]  509 U.S. 579 (1993).

expert; (2) the witness's expertise "will help the trier of fact to understand the evidence or to determine a fact in issue"[7]; (3) the witness's testimony is "based on sufficient facts or data"[8]; (4) "the testimony is the product of reliable principles and methods"[9]; and (5) "the expert has reliably applied the principles and methods to the facts of the case."[10] The Rule thus elevates the trial judge's role as gatekeeper; it essentially provides that "when a party proffers expert scientific testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"[11] The objective of this requirement "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[12] The gatekeeping role is *not* intended "to displace the normal tools of the

---

[7] Fed. R. Evid. 702(a).

[8] Fed. R. Evid. 702(b).

[9] Fed. R. Evid. 702(c).

[10] Fed. R. Evid. 702(d).

[11] *Motorola*, 147 A.3d at 754 (quoting *Daubert*, 509 U.S. at 592-93). The same general requirements apply to non-scientific expert testimony. *Id.* at 755 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) and Rule 702(a)).

[12] *Id.* (quoting *Kumho Tire*, 526 U.S. at 152).

adversary system," in which "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[13]   Both the preliminary reliability determination and the manner in which it is made are committed to the trial judge's discretion, reviewable for abuse.[14]

At appellant's first trial, which was held before our decision in *Motorola*, he objected (unsuccessfully) to the admission of McCarthy's testimony under the then-applicable *Dyas/Frye* test.[15]   Prior to his second, post-*Motorola* trial, appellant moved for a pretrial evidentiary hearing (commonly called a "*Daubert* hearing") to evaluate the reliability of the testing that McCarthy had performed.   The judge denied this request; after reviewing the transcript of McCarthy's testimony at the first trial, he deemed an evidentiary hearing unnecessary and was satisfied the testimony would be admissible under Rule 702.   Thereafter, at trial, appellant moved to strike McCarthy's testimony for failure to meet the Rule's reliability

---

[13]   *Id.* at 754 (quoting *Daubert*, 509 U.S. at 596).

[14]   *Id.* at 755 (citing *Kumho Tire*, 526 U.S. at 158).

[15]   Appellant argued that McCarthy's testimony would not aid the jury in determining the facts at issue, and that it would be more prejudicial than probative.

requirements. The judge denied this motion, concluding *inter alia* that appellant's objections went to the weight of the evidence rather than its admissibility.

Appellant now argues that the trial court abused its discretion in admitting McCarthy's expert opinion testimony at his retrial. He identifies four overlapping respects in which, he contends, the court erred. First, appellant argues, the court erred in declining his request for a pretrial *Daubert* hearing. Second, appellant contends McCarthy's experiments were not applied reliably to the facts of this case, as Rule 702(d) requires. Third, appellant further argues that McCarthy's experiments were not relevant to whether the fire was intentionally set, and that even if relevant, their probative value was minimal and outweighed by the danger of unfair prejudice. Fourth, appellant asserts the court also erred by permitting McCarthy to opine on the ultimate issue of appellant's intent. There is no question that appellant preserved the first two of these claims by raising them in timely fashion in the trial court in connection with his second trial. The parties disagree over whether appellant preserved the third claim, which reprises objections he lodged unsuccessfully at his first trial. However, the trial judge expressed his own understanding that appellant was objecting on relevance grounds and specifically cited Federal Rule of Evidence 403 (which requires the judge to weigh probative value against the danger of unfair prejudice). We therefore treat appellant's third

objection as preserved. Appellant raises his fourth objection to McCarthy's testimony for the first time in this appeal, though, so he must establish plain error to prevail on it here.

Addressing each of appellant's objections in turn, we conclude that the trial judge did not abuse his discretion in admitting McCarthy's expert testimony.

**1. The Trial Court Did Not Err by Declining to Hold a Pre-Trial *Daubert* Hearing.**

As we reiterated in *Motorola*, Rule 702 allows trial courts "broad latitude" and "considerable leeway" in deciding how to go about making the preliminary assessment of the reliability of proffered expert testimony.[16] "[T]here is no particular procedure that the trial court is required to follow in executing its gatekeeping function under *Daubert*,"[17] and the court has the discretion "to avoid unnecessary reliability proceedings."[18] Rule 702 and *Daubert* do not require a pre-trial evidentiary hearing as long as the trial court has a sufficient evidentiary basis

---

[16] *Id.* at 755 (quoting *Kumho Tire*, 526 U.S. at 141-42, 152).

[17] *United States v. Diaz*, 300 F.3d 66, 73-74 (1st Cir. 2002).

[18] *Motorola*, 147 A.3d at 758 (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments and *Kumho Tire*, 526 U.S. at 152).

without it for its decision.[19]  In *Kumho Tire*, for example, the Supreme Court upheld a reliability determination based on the trial court's review of the proposed expert's deposition testimony.[20]

Here, the trial judge reviewed the transcript of McCarthy's expert testimony at appellant's first trial to make the threshold reliability determination required by Rule 702.  This was neither unreasonable nor unfair to appellant.  In the first trial, McCarthy fully described his testing principles and methodology and their application to the evidence in this case, and appellant had and exercised the opportunity to challenge his expert opinion testimony by cross-examination and

[19] *See, e.g.*, *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999) (holding the trial court did not abuse its discretion by declining to hold a pre-trial evidentiary *Daubert* hearing because the challenged testimony did not involve any new scientific theories); *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir.1998) (holding the trial judge "had a sufficient basis for her decision without holding a hearing" and further explaining that "[w]e have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony"); 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.02[2] (2d ed. 2000) ("The admissibility of expert testimony is often decided after a separate hearing.  However, the trial judge is not required to hold a hearing on the admissibility of expert evidence.").

[20]  526 U.S. at 142, 145-46, 152.  *See also Oddi v. Ford Motor Co.*, 234 F.3d 136, 153-54 (3d Cir. 2000) (in limine hearing unnecessary where trial court could make preliminary reliability determination based on expert's deposition testimony and reports, and where opponents of admission did not show the record was incomplete or that they had new or additional information to present).

argument. McCarthy's testimony at the retrial did not materially diverge from his earlier testimony.[21] The judge found it "clear" from the transcript that McCarthy reached his conclusions in this case by applying scientific principles of fire origin and causation (along with his own "vast" experience) in tests designed to cover the range of possible conditions under which the fire occurred.[22] The judge also specifically considered factors identified in *Daubert* as potentially bearing on reliability of McCarthy's methods and their applicability in this case.[23] Among other

---

[21] At the first trial, McCarthy did not note the possibility that the fire had multiple points of origin in the basement. Although he did acknowledge that possibility at the second trial, he did not affirmatively opine that there were multiple points of origin, nor did he rely on that possibility in formulating and presenting his conclusions. We therefore do not view this as a material deviation from his previous testimony.

[22] *Cf. Aman*, 748 F. Supp. 2d at 535-36 ("The general methodology NFPA 921 recommends for investigating the cause of a fire is essentially the well-known 'scientific method' of generating and testing hypotheses [citing *Daubert*, 509 U.S. at 593]. . . . Because the methodology described in NFPA 921 has been peer reviewed, is generally accepted in the field of fire investigation, and incorporates the classic scientific methodology . . . , the methodology is reliable within the meaning of Rule 702 . . . and *Daubert*." (citing cases)).

[23] *See Daubert*, 509 U.S. at 593-94; *Motorola*, 147 A.3d at 754. The judge found some of these factors, such as the known or potential error rate of the test procedure, to be inapplicable to McCarthy's tests. We perceive no error in that finding. *Cf. Aman*, 748 F. Supp. 2d at 536 ("While a known error rate is also a factor to be considered in a *Daubert* analysis, a known error rate is not strictly required under *Daubert*. 509 U.S. at 593-94 (emphasizing that the *Daubert* factors are not a 'definitive checklist,' and that 'the inquiry envisioned by Rule 702 is . . . a flexible one')").

things, the judge noted that McCarthy employed "principles that are longstanding principles for use in the field" and invoked "a number of national studies . . . as a basis for some of the conclusions that he reache[d]"; that McCarthy evaluated alternative possible explanations for the fire; that McCarthy explained how and why the evidence supported his conclusions; and that McCarthy was not "extrapolating from a premise to an unfounded conclusion."

Because the trial judge was able to make a preliminary reliability determination based on the evidentiary record from appellant's first trial, we conclude the judge did not abuse his discretion by denying appellant's request for a pretrial *Daubert* hearing. Such a hearing was not necessary to comply with Rule 702.

**2. The Trial Court Did Not Err by Finding That McCarthy's Experiments Were Reliably Applied to the Facts of This Case.**

Rule 702(d) requires a determination that "the expert has reliably applied the principles and methods to the facts of the case." Appellant asserts that the experiments McCarthy performed to determine the likelihood that a cigarette ignited the fire in the mattress, and how long it would have taken to do so, were not reliably applied to the facts of this case, because the test conditions were not substantially similar to the conditions in appellant's basement at the time of the fire. Specifically,

appellant emphasizes that witnesses could not specify, and therefore McCarthy did not know, the specific type and material of the bedding on appellant's mattress, if any, on the morning of the fire.

The appropriateness of scientifically valid experiments to test hypotheses of fire causation is not in question. "Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. 'Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.'"[24] Courts have excluded fire expert testimony because the experts failed to test their hypotheses as to the causes of fires.[25]

---

[24] *Daubert*, 509 U.S. at 593 (citation omitted).

[25] *See, e.g.*, *Atl. Specialty Ins. Co. v. Porter, Inc.*, No. CV 15-570, 2016 U.S. Dist. LEXIS 145415, at *17-*19 (E.D. La. Oct. 20, 2016), *aff'd*, 742 F. App'x 850 (5th Cir. 2018) (expert testimony held inadmissible where the expert "never did any testing to confirm his hypothesis" as to cause of fire); *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) ("The failure of Pride's experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of this case renders their testimony on the cause and origin of the fire unreliable and therefore inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104."); *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 938 (N.D. Ind. 1999) (excluding electrical engineering expert's testimony in fire case in part because the expert never did "any testing to

For an experiment meant to demonstrate what actually happened to be reliably applied to the relevant facts, its conditions must be "substantially similar to those of the alleged occurrence."[26] This "does not require an identity of conditions but only that degree of similarity which will insure that the results of the experiment are probative."[27] We recognize that "[n]o event can be perfectly reenacted . . . and dissimilarities that are neither material nor misleading do not bar admission of experimental evidence."[28] Possible dissimilarities and uncertainties can be taken into account and "adjusted for or explained so that their effect on the results of experiments can be understood by the jury" and jurors can assess the probative value of those results.[29] The initial evidentiary determination of whether experiments are substantially similar to the facts at issue "may not always be capable of a mechanical solution . . . . [and] [f]requently common sense provides a good guide to whether a

---

determine how many volts it would actually take" to start the fire in the manner the expert hypothesized).

[26] *Butts v. United States*, 822 A.2d 407, 414 (D.C. 2003) (quoting *Taylor v. United States*, 661 A.2d 636, 643 (D.C.1995)).

[27] *Id*. at 414-15 (quoting *Love v. State*, 457 P.2d 622, 627 (Alaska 1969)).

[28] *Id*. at 415 (quoting *State v. Ritt*, 599 N.W.2d 802, 812 (Minn. 1999)).

[29] *Id.* (quoting *Taylor*, 661 A.2d at 644).

factor entering into an evidentiary determination is substantial or merely unimportant."[30]

In *Butts*, for example, the defendant, impaired by alcohol, had driven at twenty-five miles per hour down a city street on "a dark and rainy night" and had struck and killed a pedestrian there.[31] At her trial for negligent homicide, a prosecution expert in accident reconstruction testified about a visibility study he had performed. "The study was conducted at night, while it was raining, on a wet roadway, in the same model car as the one [the defendant] was driving, traveling at the same speed as [the defendant], with a mannequin dressed in dark clothing" positioned at the site of the collision.[32] By photographing the mannequin from the car at various distances, the expert concluded that an unimpaired driver could have detected the pedestrian from a distance of 300 feet and had ample time to react and avoid hitting him.[33] The defendant argued that certain conditions of the study so differed from the conditions on the night of the accident that the study lacked

---

[30] *Id*. (quoting *Love*, 457 P.2d at 628).

[31] *Id.* at 412.

[32] *Id.* at 415.

[33] *Id.* at 414.

probative value. In particular, the study used a mannequin that had a lighter complexion than the pedestrian who was hit, it ignored the adverse effects on visibility of same-lane traffic and spray from other vehicles in the rain, and the street light above the point of impact was lit during the study but may not have been on the night in question.[34] Nonetheless, this court held that the trial court did not abuse its discretion by admitting the expert's testimony. "Common sense tells us," the court explained, that "all substantial conditions from the night of the accident were adequately re-created during the visibility study, and that the dissimilarities . . . were slight in comparison."[35] "Moreover," we said, "the dissimilarities [were] of the type that could easily be, and in fact were, explained to the jury for it to consider when assessing the weight of the evidence."[36]

In this case, we reach the same conclusions. The exact conditions of the mattress and its possible bedding at the time of the fire could not be known with certainty. But there were limits to the area and range of uncertainty, because the witnesses were able to provide some relevant information. The make of the mattress

---

[34] *See id.* at 412 n.3, 414, and 415 n.6.

[35] *Id.* at 415.

[36] *Id.*

itself was known — it was a Sealy Posturepedic purchased in 2010. Appellant's bedding was described as a fleece blanket and a "basic" sheet. (We note that in one of his recorded conversations, appellant himself referred to the material that caught fire as "cotton.") There was no evidence of any additional bedding or other flammable items on the mattress, or of any unusual conditions that might have had a bearing on how the fire erupted. The residual uncertainties mainly related to the particular composition of the blanket and sheet, how they were configured on the mattress at the time of the fire, and whether air currents in the basement affected the fire's growth. McCarthy identified these uncertainties and accounted for them by performing over a thousand tests covering a range of possibilities. He designed those tests in light of the available evidence, his research in the fire investigation literature, and his consultation with his ATF peers. McCarthy tested sheets and fleece blankets composed of 100% cotton, 100% synthetic material, and a 50/50 cotton and synthetic blend. He arranged the bedding in different configurations and employed forced air to see how the variations affected the outcome of the experiments.

By these means, we are satisfied the trial judge could find that McCarthy reliably applied his methodology to the facts of this case and ensured that his tests would be probative and not misleading to the jury. To the extent there remained possible dissimilarities between the test conditions and the conditions existing at the

scene of the fire, they were fodder for cross-examination and the presentation of contrary expert testimony, but they were not substantial enough to bar admission of McCarthy's testimony.[37]

### 3. McCarthy's Experiments Were Relevant and Their Probative Value Was Not Substantially Outweighed by the Danger of Unfair Prejudice.

Appellant claims that McCarthy's experiments were not relevant to prove a fact in issue, because appellant never denied that the mattress caught fire, only that he *intentionally* set it on fire. Alternatively, appellant asserts that the danger of unfair prejudice substantially outweighed whatever probative value the experiments had. Neither contention is persuasive.

---

[37] *Cf. United States v. Santiago*, 202 F. App'x 399, 401-02 & n.3 (11th Cir. 2006) (upholding admission of arson investigator's experiments to recreate the scene of a fire, which involved "attempts to use cigarettes in different positions and later an open flame to ignite cardboard, plastic wrap, bags, and tape," where "the trial court appropriately determined that any differences in conditions between the warehouse and [the investigator's] laboratory were negligible"); *Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 427 (S.D.N.Y. 2002) (holding expert's testimony on origin and cause of a fire to be reliable and admissible, where the expert analyzed the data and developed his hypothesis, "relied on deductive reasoning, a method recognized as 'scientific,' . . . identified all of the potential ignition scenarios," and eliminated certain causes, including "careless disposal of cigarettes, . . . based on a reasonable analysis of the circumstances").

"[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."[38] We perceive no abuse of that discretion here.

"Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[39] This relevance standard applies to expert testimony as much as to other evidence; it is inherent in the requirement of Rule 702(a) that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." The test for relevancy is not a stringent one. "Ordinarily, any evidence which is logically probative of some fact in issue is admissible and if the evidence offered conduces in any reasonable degree to establish the probability or improbability of a fact in controversy, it should go to the jury."[40]

---

[38] *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C. 1996) (en banc).

[39] *Plummer v. United States*, 813 A.2d 182, 188 (D.C. 2002) (quoting *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992)).

[40] *Id.* at 188-89 (brackets omitted; quoting *Dockery v. United States*, 746 A.2d 303, 306 (D.C. 2000)).

McCarthy's experiments were probative of a material and contested issue in this case. As he explained, the experiments showed that if a dropped cigarette caused the fire in appellant's mattress, it likely would have taken long enough to ignite the bedding that anyone watching would have had ample time to extinguish the fire before it got out of control. (Alternatively, if the fire was set with a match or other flame, that implied someone deliberately held it to the flammable material of the bedding.) The experiments therefore provided evidence tending to establish that the fire was incendiary, i.e., intentionally maintained, a disputed fact material to whether appellant had the mens rea for both first-degree cruelty to children and murder.[41] The experiments unquestionably were relevant.

Nor has appellant shown that their probative value was substantially outweighed by the danger of unfair prejudice.[42] In this context, "unfair prejudice"

---

[41] To prove first-degree cruelty to children, the government had to show that appellant intentionally, knowingly, or recklessly engaged in conduct that created a grave risk of bodily harm to a child. D.C. Code § 22-1101(a). The same mens rea is incorporated in the first-degree felony murder charge predicated on first-degree cruelty to children and in second-degree murder.

[42] *See Johnson*, 683 A.2d at 1099 (adopting Federal Rule of Evidence 403 and holding that relevant evidence may be excluded if its probative value is substantially outweighed by unfair prejudice). "The 'substantially outweighs' approach is apparently the product of the general federal policy promoting the admission of as much relevant evidence as reasonably possible." *Id.*

means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[43] Appellant has made no showing of any likelihood of such prejudice from McCarthy's testimony. In his brief on appeal, appellant argues that the jurors might have over-valued McCarthy's opinion on "the central question before them" because they "were aware McCarthy had participated in the investigation of this case as an ATF agent and was privy to much information not disclosed to the jury (such as witness statements; appellant's statement to police; thousands of photographs)."[44] This is utter speculation. It lacks record support, and it is untethered to the issue of whether the trial judge should have excluded McCarthy's specific testimony about the experiments he performed. We attach no weight to appellant's imaginary scenario of prejudice.

---

[43] *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999) (quoting Fed. R. Evid. 403 advisory committee's note); *see also Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

[44] Brief for Appellant at 34-35.

## 4. The Trial Court Did Not Plainly Err by Allowing McCarthy to Opine on Whether Appellant Caused the Fire Intentionally.

Appellant claims, for the first time on appeal, that McCarthy should not have been allowed to opine on whether appellant "did or did not have the mental state or condition constituting an element of the crime charged or of a defense,"[45] as such opinion testimony is specifically prohibited in federal criminal cases by Federal Rule of Evidence 704(b). Since appellant did not object at trial to McCarthy's testimony on this ground, he must, to prevail, show "plain error" – meaning a clear or obvious error that affected appellant's substantial rights and that, if left uncorrected, would permit a miscarriage of justice to stand or otherwise compromise the fairness, integrity, or public reputation of judicial proceedings.[46] Appellant has not shown the trial judge clearly erred in allowing McCarthy to opine that the fire was incendiary in nature.

This court has not adopted Federal Rule of Evidence 704(b). It "has noted multiple times that Rule 704(b) did not disrupt our 'local law of evidence . . . which

---

[45] *Id.* at 31-32.

[46] *See, e.g.*, *Williams v. United States*, 210 A.3d 734, 738 & n.7 (D.C. 2019) (rejecting unpreserved challenge to erroneous admission of expert opinion testimony for failure to satisfy all the requirements of plain error). *See generally Comford v. United States*, 947 A.2d 1181, 1189-90 (D.C. 2008).

does not prohibit expert witnesses from stating opinions on ultimate facts or issues to be resolved by the jury."[47] Thus, "in conflict with Rule 704(b), D.C. [law] allows an expert in criminal cases to testify to a defendant's 'mental state or condition.'"[48] Moreover, McCarthy did not express an opinion as to *appellant's* mental state or condition. Rather, he testified only that his experiments, by showing how long it likely would have taken an accidentally dropped cigarette to ignite the mattress, supported a conclusion that the fire was incendiary, i.e., intentionally set by *someone*. He did not opine that appellant in particular intentionally set the fire. While "[a]n expert's opinion that a specific defendant had the 'intentions' [constituting an element of the crime charged] might be thought a determination prohibited by Rule 704(b)," expert testimony that only addresses "the intentions of a hypothetical individual, not [the defendant] in particular" has been held not to run afoul of that Rule.[49] Be that as it may, given that our local law allows expert

---

[47] *Jackson v. United States*, 76 A.3d 920, 940 (D.C. 2013) (holding that expert may testify as to defendant's mental state in an insanity case) (quoting *Blaize v. United States*, 21 A.3d 78, 84 n.8 (D.C. 2011); brackets omitted).

[48] Hon. Steffen W. Graae, Brian T. Fitzpatrick, & Hon. Henry F. Greene, *The Law of Evidence in the District of Columbia* § 704.01[2] (6th ed. 2020).

[49] *United States v. Williams*, 980 F.2d 1463, 1466 (D.C. Cir. 1992). *See also United States v. Mejia*, 448 F.3d 436, 449 & n.9 (D.C. Cir. 2006) (Rule 704(b) not violated where expert witness only testified about "drug organizations in general" and "never offered an opinion regarding the mental state of the defendants"); *United States v. Smart*, 98 F.3d 1379, 1388 (D.C. Cir. 1996) (stating expert "testimony

witnesses to state opinions on ultimate issues, including a defendant's mental state, the trial judge did not plainly err by allowing McCarthy's testimony in this case.

## B. Appellant's Request for a Civil Negligence Instruction

Appellant asserts the trial judge erred in denying his request for an instruction on civil negligence. In seeking the instruction, appellant's counsel argued that negligence was "a key part of the defense" and there was a "very significant factual foundation" that the fire "was negligently set." He clarified, however, that he did not want the negligence instruction to be included in the instruction on the defendant's theory of the case, "because we're not conceding that the defendant acted in any way whatsoever." Rather, he explained, "negligence can mean a lot of different things to a lot of different people," and "it's best that [the jurors] get . . . their definition directly from the Court." When the judge asked counsel if he was

---

should not be excluded under Rule 704(b) as long as it is made clear . . . that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes") (internal quotation marks and citation omitted)); *United States v. Lundy*, 809 F.2d 392, 394, 396 (7th Cir. 1987) (upholding admission of fire expert's testimony under Federal Rule of Evidence 403, where expert "only testified that in his opinion fire was not accidental," "included a detailed rationale for his opinion that the fire was purposefully set," and "never testified that Lundy or anyone else in particular caused the fire").

"committing . . . to argue" negligence, counsel responded, "No, definitely not." The government opposed the request. The prosecutor argued that "negligence has no place in the instructions" because "[t]his is a criminal matter" and the offense instructions already cover the subject by requiring proof that the defendant acted intentionally or consciously disregarded an extreme risk.

In declining to instruct the jury on civil negligence, the judge reasoned that the instruction would "create[] confusion," "it would be difficult for the jurors to . . . separate out what the [offense] elements are and then look at a very different standard for negligence," and the criminal "instructions adequately spell out the necessary mental state" for the charged offenses.

We review a trial court's decision on whether to give a requested jury instruction for abuse of discretion, viewing the instructions as a whole, and considering the record in the light most favorable to the requesting party.[50] "When a defendant requests an instruction on a theory of the case that negates his guilt of the crime charged, and that instruction is supported by any evidence, however weak,

---

[50] *Washington v. United States*, 111 A.3d 16, 23 (D.C. 2015) (holding that trial court did not abuse its discretion in declining to give missing evidence instruction).

an instruction stating the substance of the defendant's theory must be given."[51] However, "the instruction need not be framed in the exact language proposed by the defendant."[52]

The instruction that appellant specifically requested, Instruction 5-2 of the Standardized Civil Jury Instructions for the District of Columbia (2014 ed.), stated that "[n]egligence is the failure to exercise ordinary care," i.e. "to use the same caution, attention or skill that a reasonable person would use under similar circumstances."[53] Although appellant's counsel strongly indicated he did not intend to make a negligence argument, we presume he wished to rely in some way on Instruction 5-2 to inform the jury it could not find appellant criminally liable unless it found him more than merely negligent, i.e., that the fire was not due to his mere failure to exercise ordinary care. We are not persuaded there was evidence at appellant's trial supporting a "simple negligence" theory of the fire's origin. But

---

[51] *Gray v. United States*, 549 A.2d 347, 349 (D.C. 1988).

[52] *Id.*

[53] Instruction 5-2 went on to say, "It is negligent to do something that a person using ordinary care would not do. It is also negligent to fail to do something that a person using ordinary care would do."

even if there was, an instruction on that theory would have been superfluous at best, if not, indeed, confusing and misleading.

That is so for three reasons. First, the offense instructions given by the judge did not employ the term "negligence," so appellant's expressed concern that the jury needed to be instructed on its proper legal definition was unfounded. And the definition of negligence that appellant proposed, "failure to exercise ordinary care," was, without more, too broad to be useful to the jury, as that definition encompasses failures that are reckless or intentional as well as failures we think of as merely careless. Second, negligence was not a defense to the charges in this case (nor did appellant claim he intended to argue negligence as the theory of his defense).[54]

---

[54] As the Supreme Court of Indiana explained in a case holding that a defendant convicted of criminal recklessness in the discharge of a firearm was not entitled to an instruction on negligence,

> Negligence, as used by Defendant here, is an argument, not a legal defense. Defendant's legal defense was and is that he is not guilty of criminal recklessness because his actions did not meet the legal requirements of recklessness. The jury was properly instructed that the State was required to prove beyond a reasonable doubt that Defendant had acted "in plain, conscious and unjustified disregard of the harm that might result therefrom, and the disregard involved a substantial deviation from acceptable standards of conduct." Defendant was free to and did argue that he did no more than fail "to exercise reasonable or ordinary care." As the trial court accurately observed,

Third, the judge made it crystal clear that the charges in this case all required proof of more than negligence. The charge of first-degree cruelty to children requires the prosecution to prove that the defendant intentionally, knowingly, or recklessly engaged in conduct creating a grave risk of bodily harm to a child and causing bodily harm.[55] The same degree of culpability is required to prove both first-degree felony murder based on first-degree cruelty to children[56] and the (lesser included) offense of second-degree murder.[57] The trial judge accurately and explicitly instructed the jury it would need to find such heightened culpability to convict appellant of each

---

> Defendant's negligence argument is simply a statement that State failed to prove that he was reckless. No additional instruction to the jury on this point was required.

*Springer v. State*, 798 N.E.2d 431, 435 (Ind. 2003).

[55] *See* D.C. Code § 22-1101(a).

[56] *See Kitt v. United States*, 904 A.2d 348, 355 (D.C. 2006) ("The only intent required to be guilty of [first-degree felony murder based on an enumerated felony] is the intent to commit the underlying felony." (citing *Lee v. United States*, 699 A.2d 373, 385 (D.C. 1997))).

[57] *See Robinson v. United States*, 928 A.2d 717, 728 (D.C. 2007) (Second degree murder requires proof that "(1) the defendant caused the death of the victim; (2) the defendant had the specific intent to kill or commit serious bodily injury on the victim, or acted with conscious disregard [of] an extreme risk of death or serious bodily injury to the decedent; and (3) there were no mitigating circumstances." (citing *Williams v. United States*, 858 A.2d 984, 993 n.11 (D.C. 2004))).

offense. "Intentionally," the judge elaborated, "means that [appellant] acted voluntarily and on purpose. Not by mistake or accident."[58] "Recklessly," the judge instructed, "means that [appellant] was aware of and disregarded the grave risk of bodily harm his conduct created."[59] As the instructions manifestly required a finding of more than negligence, and did not even mention the term, we conclude the judge did not abuse his discretion in declining appellant's request for an instruction defining negligence. We see no reason to suppose the jury could have been confused on this point.[60]

---

[58] *See, e.g.*, *Jones v. United States*, 813 A.2d 220, 225 (D.C. 2002) (explaining that the words "intentionally or knowingly. . . . refer[] to an act that 'was deliberate or on purpose, not accidental.'" (quoting *Campos v. United States*, 617 A.2d 185, 189 (D.C. 1992))).

[59] *See, e.g.*, *Thompson v. United States*, 690 A.2d 479, 482-83 (D.C. 1997) ("Because the defendant's state of mind must be wrongful, . . . we must not permit the adjective 'reckless' . . . to become a synonym for 'negligent.'. . . A defendant is therefore 'reckless' only if he intentionally does an act with a willful disregard of its potential consequences." (cleaned up)).

[60] We do not mean to say that a criminal defendant could never be entitled to an instruction explaining the difference between criminal recklessness and non-criminal negligence. For example, in *Springer* the Supreme Court of Indiana acknowledged that such an instruction may be required to guide the jury in cases involving "conduct that *can* be undertaken with due care" (e.g., driving a car) and a genuine issue as to whether the defendant's failure to exercise due care was negligent or reckless. *Springer*, 798 N.E.2d at 436; *see also New v. State*, 135 N.E.3d 619, 624 (Ind. Ct. App. 2019). But this is not such a case.

## C. Sufficiency of the Evidence

Appellant asserts the evidence in its entirety was insufficient to prove beyond a reasonable doubt that he intentionally, knowingly, or recklessly set the fire that killed S.M.J. However, viewing the evidence, as we must, in the light most favorable to sustaining the jury's verdict,[61] we disagree. We readily conclude there was more than sufficient evidence allowing the jury to find beyond a reasonable doubt that appellant intentionally set the fire to burn down his house and recklessly endangered the lives of all its other occupants. This evidence included: (1) the eyewitness and expert testimony establishing that the fire emanated from appellant's room, originated on his mattress there, and was incendiary in origin; (2) the video and other evidence establishing that appellant (alone) was present in the basement and active in the early morning hours leading up to the fire; (3) the eyewitnesses' accounts of appellant's strange and unconcerned behavior after the fire erupted; (4) the half-used book of matches found in appellant's pocket when he was arrested; and (5)

---

[61] *See, e.g.*, *Dickerson v. United States*, 650 A.2d 680, 683 (D.C. 1994).

appellant's admission that he set the fire ("what I'm burning") and was "literally watching what [he was] burning."[62]

Appellant also argues that the evidence was insufficient to prove he knew he was creating an extreme risk of death or serious bodily injury to S.M.J. by setting the fire. This argument, too, is unavailing. Starting an uncontrolled fire in the middle of the night in a house where a young child is known to be sleeping, and doing nothing to alert anyone or protect that child, "constitutes at least reckless behavior creating a grave risk of bodily injury to the child."[63]

## D. Motion for a New Trial

Appellant asserts the trial judge erred in denying his motion for a new trial, in which he argued that the jury's verdicts were inconsistent and there was insufficient evidence to support his convictions. We have already disposed of the latter ground. As to the former, appellant principally argues that by acquitting him of arson, the

---

[62] In addition, the evidence that appellant was in financial difficulties and connived with a friend to submit an inflated insurance claim for the fire damage supplied a possible pecuniary motive for him to set the fire.

[63] *Phenis v. United States*, 909 A.2d 138, 164 (D.C. 2006).

jury found he did not intentionally set his house on fire. In rejecting this argument, the trial court noted that "juries are permitted to return inconsistent verdicts."[64]

A "trial court's denial of a motion for new trial is reviewed for abuse of discretion. We will not reverse if the denial is reasonable and supported by the record."[65] A "new trial will be ordered in the interest of justice only when, after considering the evidence, the court can find that 'exceptional circumstances' prevented the defendant from receiving a fair trial."[66] Such exceptional circumstances are absent here, and we perceive no abuse of discretion or other error on the part of the trial judge in denying appellant's motion. As we have said, the proof at trial amply supported the jury's guilty verdicts, and it is well-settled that "a not guilty verdict to one count of an indictment that is inconsistent with a guilty verdict to another count cannot invalidate the guilty verdict so long as the guilty

---

[64] Citing *Hamling v. United States*, 418 U.S. 87, 101 (1974).

[65] *Green v. United States*, 164 A.3d 86, 90 (D.C. 2017).

[66] *Tyer v. United States*, 912 A.2d 1150, 1167 (D.C. 2006) (quoting *Huggins v. United States*, 333 A.2d 385, 387 (D.C. 1975)).

verdict is based upon sufficient evidence."[67]  The trial judge properly abided by that rule.[68]

## III. Conclusion

---

[67]  *Ransom v. United States*, 630 A.2d 170, 172 (D.C. 1993) (holding that acquittal for assault with a dangerous weapon did not invalidate conviction for possession of a firearm during a crime of violence predicated on the assault); *see also, e.g.*, *Smith v. United States*, 684 A.2d 307, 312 (D.C. 1996) (acknowledging this court's "settled jurisprudence upholding criminal convictions based on inconsistent verdicts as long as there was evidence to support the convictions").

[68]  Appellant also argues that the felony murder and child cruelty statutes are inconsistent, because felony murder can be based on an "accidental" killing (occurring in the course of committing one of the predicate felonies), while cruelty to children cannot be based on purely accidental conduct.  Appellant is confused; there is no inconsistency in finding a defendant guilty of felony murder for an accidental death that arises out of the defendant's non-accidental commission of child cruelty.

Lastly, appellant argues that his conviction for second-degree murder cannot stand because, where that offense is charged only as a lesser included offense of felony murder, there must be proof (absent here) of "an intentional killing on impulse." *Fisher v. United States*, 749 A.2d 710, 712 (D.C. 2000).  That is a misreading of *Fisher*; while proof of such an intentional killing would suffice, the jury was permitted to convict appellant of second-degree murder as a lesser included offense of felony murder on finding the element of malice based on recklessness. *See id.* at 712-13.

For the foregoing reasons, we affirm appellant's convictions. We remand for the trial court to vacate the second-degree murder and child-cruelty convictions, both of which merge into appellant's conviction for first-degree felony murder.[69]

---

[69] *See Byrd v. United States*, 510 A.2d 1035, 1036-37 (D.C. 1986) (en banc); *Page v. United States*, 715 A.2d 890, 894 n.6 (D.C. 1998); *Lee v. United States*, 699 A.2d 373, 382-83 (D.C. 1997).